# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

**SHEREE C. SAMETINI,**

      **Plaintiff,**

**v.**                                                                     **Case No. 3:13cv107/CJK**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

      **Defendant.**

_____/

## MEMORANDUM ORDER

This case is before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Sheree C. Sametini's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-34. The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73 for all proceedings in this case, including entry of final judgment. Upon review of the record before this court, I conclude that the findings of fact and determinations of the Commissioner are not supported by substantial evidence and that the proper legal standards were not applied. The decision of the Commissioner, therefore, will be reversed and the plaintiff will be awarded benefits.

## ISSUES ON REVIEW

Plaintiff, who will be referred to as claimant, plaintiff, or by name, raises four issues. She claims: 1) the Administrative Law Judge ("ALJ") erred by failing to pose

a proper hypothetical question to the vocational expert; 2) the ALJ erred in finding that she had transferable skills from her past relevant work as a file clerk; 3) the ALJ failed to properly assess her credibility; and 4) the ALJ erred by rejecting the opinions of her treating physicians and rendering a residual functional capacity assessment that is not supported by the medical evidence.

## PROCEDURAL HISTORY

The claimant filed her application for DIB on May 5, 2010, alleging disability beginning on June 15, 2004. T. 161.[1] Plaintiff's claim initially was denied. T. 102-07. Claimant appeared before an Administrative Law Judge ("ALJ") for a hearing on September 13, 2011, during which she amended her alleged onset date to December 8, 2007, her fiftieth birthday. T. 73-92. On October 19, 2011, the ALJ issued a decision denying plaintiff's claim for benefits. T. 56-72. Claimant petitioned the Appeals Council of the Social Security Administration for a review of the ALJ's decision. T. 50-52. The Appeals Council denied claimant's request for further review; as a result, the ALJ's decision became the final determination of the Commissioner. T. 1-14.

## FINDINGS OF THE ALJ

In her written decision, the ALJ made a number of findings relative to the issues raised in this appeal:

•   Claimant has the following severe impairments: fibromyalgia, myofascial pain, fatigue, idiopathic torsion dystonia, spasmodic torticollis, migraine headaches,

---

[1] The administrative record, as filed by the Commissioner, consists of ten volumes (docs. 10-1 through 10-10), and has 595 consecutively numbered pages. References to the record will be by "T.," for transcript, followed by the page number.

cervical degenerative disc disease, hypothyroidism, and osteoarthritis of the sacroilia joints and lumbar spine.  T. 58.

• Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, and 404.1526). T. 59.

• Claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except that she can sit for six hours out of eight, walk for two hours out of eight, and stand for two hours out of eight.  She also must have a sit/stand option at her place of employment.  T. 60.

• Claimant is unable to perform any past relevant work (20 C.F.R. 404.1565). T. 65.

• Claimant was born on December 8, 1957, and was 46 years old on the initial alleged disability onset date; as a result, she is defined as an individual closely approaching advanced age (20 C.F.R. 1563).  T. 65.

• Claimant has acquired work skills from past relevant work (20 C.F.R. 404.1568).  T. 65.

• Considering claimant's age, education, work experience, and residual functional capacity, claimant has acquired work skills from past relevant work that are transferrable to other occupations with jobs existing in significant numbers in the national economy (20 C.F.R. 404.1569, 404.1569(a), and 404.1568(d)).  T. 65-66.

• Claimant has not been under a disability, as defined in the Social Security Act, from June 15, 2004, through the date of the decision (20 C.F.R. 404.1520(g)). T. 66.

## STANDARD OF REVIEW

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the ALJ applied the correct legal standards. *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). With reference to other standards of review, the Eleventh Circuit has said that "'[s]ubstantial evidence is more than a scintilla . . . .'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (*quoting Lewis*, 125 F.3d at 1439). Although the ALJ's decision need not be supported by a preponderance of the evidence, therefore, "it cannot stand with a 'mere scintilla' of support." *See Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *See Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

When reviewing a Social Security disability case, the court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner] . . . .'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). A reviewing court also may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in

the record which detracts from the evidence relied on by the ALJ." *See Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). Review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record." *See Flynn v. Heckler*, 768 F.2d. 1273 (11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No. 2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011).[2]

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff not only is unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2. If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

---

[2] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

3.  If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.  If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.[3]

5.  Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

"[R]esidual functional capacity is the most [claimant] can still do despite [claimant's] limitations."[4]  20 C.F.R. § 404.1545(1).  The ALJ establishes residual

---

[3] Claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  *Chester v. Bowen*, 792 F. 2d 129, 131 (11th Cir.  1986).

[4] In addition to this rather terse definition of residual functional capacity, the Regulations describe how the Commissioner makes the assessment:

(3) Evidence we use to assess your residual functional capacity.  We will assess your residual functional capacity based on all of the relevant medical and other evidence.  In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity.  (See § 404.1512(c).)  However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources.  (See §§ 404.1512(d) through (f).)  We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations.  (See § 404.1513.)  We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your

functional capacity, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence, and (2) the claimant's subjective complaints (generally complaints of pain).  Residual functional capacity is then used by the ALJ to make the ultimate vocational determination required by step five.[5]  As the Eleventh Circuit has explained,

> [i]n practice, the burden temporarily shifts at step five to the Commissioner.  The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that [s]he is unable to perform the jobs that the Commissioner lists.  The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.

*Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001); *see Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 fn.3 (7th Cir. 1987) ("The shifting of the burden of proof is not statutory, but is a long-standing judicial gloss on the Social Security Act.")).  Often, both the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict and that conflict leads, as in this case, to the points raised on judicial review by

---

symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons.  (See paragraph (e) of this section and § 404.1529.)[.]

20 C.F.R. § 404.1545(a)(3).

[5] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.)  We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."  20 C.F.R. § 404.1520(a)(4).

disappointed claimants.

### FACT BACKGROUND AND MEDICAL HISTORY[6]

At the time of the hearing before the ALJ, the plaintiff was fifty-three years old. T. 78. She was separated from her husband and living with a friend . T. 78. She had completed two years of college and previously worked as a housekeeper, jewelry salesperson, sales clerk, and file clerk but had been unemployed since December 31, 2007.[7] T. 79-81, 88. According to her testimony, plaintiff was unable to work due to severe pain and fatigue, which made it difficult for her to be "up and about" for more than a few hours a day. T. 81-83. She also had difficulty concentrating and needed to lie down for an hour at a time two to four times a day. T. 82-85. Plaintiff stated that she has fibromyalgia, chronic fatigue syndrome, "something with [her] neck," and spasmodic torticollis.[8] T. 82. Plaintiff also stated that she recently was diagnosed with autoimmune thyroid disease. T. 82. She testified that her body feels inflamed and achy, as if she has a bad flu and needs to go to bed." T. 83. Her symptoms are exacerbated by too much or too little activity and insufficient sleep. T. 83. With sleep medication, claimant "generally sleep[s] pretty well," although she

---

[6] The recitation of medical and historical facts of this case, as set out below, is based on the court's independent review of the record. Although intended to be thorough and to provide an overview of the claimant's history of care and treatment, the synopsis of medical evidence will be supplemented as necessary in the Analysis section.

[7] Prior to discontinuing her employment, the plaintiff was a self-employed housekeeper and worked approximately five hours per day, three to four days a week. T. 174-77, 193, 195.

[8] Spasmodic torticollis, also known as cervical dystonia, "is a painful condition in which your neck muscles contract involuntarily, causing your head to twist or turn to one side." http://www.mayoclinic.org/diseases-conditions/spasmodic-torticollis/basics/definition/con-20028 215. It also can cause your head to uncontrollably tilt forward or backward. *Id.*

gets up two to three times a night.  T. 83.

Plaintiff explained that her conditions "make [her] so fatigued and in so much pain that [her] day is a constant juggling act of how much [she] can accomplish, or what [she] can do in a day." T. 82. "No two days are alike." T. 82. Although plaintiff "used to have more good days than bad days," in the past few years, plaintiff has had "more bad days than good days." T. 82. She typically wakes up in the morning in a lot of pain and fatigued. T. 82-83. She eats breakfast, takes pain medication, and then goes back to bed "until the pain subsides enough to get up and do anything." T. 82-83. Once plaintiff is able to get out of bed, which generally is after an hour or so of lying down, she takes a shower and gets dressed. T. 83. When able, she does "a few things around the house," visits with her daughter, and "maybe go[es] to lunch with a friend." T. 83. Although she has to work around her condition, claimant is able to tend to her own needs by keeping things "pretty short and brief." T. 84. She drives and goes to church as often as possible, which is approximately twice a month. T. 84. When plaintiff goes to church, she typically attends only the worship service and not Sunday school. T. 84. Claimant testified that she engages in few or no social activities. T. 84. In fact, plaintiff attributes her martial problems to her inability to have a social life.[9] T. 86. When asked if she watches television, reads, or plays on the computer while lying down, plaintiff responded that she does nothing other than "concentrate on getting out of pain" and

---

[9] Plaintiff testified that her first husband, to whom she was married almost twenty years, "became so tired of [her] not being able to participate much in social activities that he found somebody else." T. 86. Plaintiff's second husband, to whom she had been married for almost fifteen years, was also "disillusioned with [her] ability to have a social life," which "create[d] a lot of problems." T. 86

perhaps sleep a bit   T. 84.   Claimant has difficulty concentrating and making decisions because she "can't think clearly enough because of the pain."   T. 85. Claimant also has a hard time understanding instructions, although she "really tr[ies] hard to concentrate and comprehend as much as [she] can."   T. 85.   When asked if she takes anything for depression, plaintiff testified that she  takes Effexor, but that it is for pain and fatigue.   T. 85.

The ALJ asked the plaintiff about her past work – in particular, her work as a medical records clerk in 1995 and 1996.   T. 80-81.   Claimant testified that she worked at a doctor's office for approximately one year, pulling and re-shelving files and making copies of records for insurance purposes.   T. 81.   Plaintiff quit her job as a file clerk because she "wasn't getting paid very much at all because it didn't require a lot of skill."   T. 81.   When asked if she could work again as a file clerk, plaintiff testified that she could not "because being up and about for more than a couple, two or three hours a day is too much for [her]."   T. 81.   Plaintiff testified that she "had done everything [she] needed to keep working" but got to the point that she would "just work a few hours and come home and not be able to do anything else."   T. 80. Claimant explained that she was working full-time as a jewelry salesperson when she had to cut back her hours, ultimately to two days a week.   T. 80.   It was as that point that claimant became a housekeeper "because [she] could do something for a couple hours and make what [she] was making at eight hours in the retail sales."   T. 80. Claimant also testified that she worked as a housekeeper because her doctor advised her to move and movement kept her "body from hurting so badly."   T. 80.   Plaintiff soon discovered, however, that she could not perform housekeeping work even a couple of hours a day.   T. 80.

A vocational expert, Eric Anderson, also testified at the hearing.   T. 86. Anderson confirmed the plaintiff's relevant work history, testifying that she worked as a cleaner/housekeeper, which is classified as light, unskilled work; jewelry salesperson, which is classified as light and skilled work; sales clerk, which is classified as light and semiskilled; and file clerk, which is classified as light and semiskilled.  T. 87-88.  Anderson also confirmed that plaintiff performed each job as it generally is performed.  T. 88.  When asked whether any of claimant's past relevant work would provide skills that could be transferred to sedentary work, Anderson responded "[n]o, ma'am."  T. 88.  The ALJ then asked Anderson about the skills required of a file clerk, which Anderson characterized as "[j]ust being able to put together files."  T. 88.  The ALJ inquired as to whether a file clerk would be required to operate office equipment, such as a copy machine, and Anderson replied in the affirmative.  T. 88.  The ALJ then asked whether a file clerk would be required to answer a telephone.  T. 88.  Anderson explained that "there can sometimes be an overlap between the work of a file clerk and a receptionist.  So there is sometimes a, some mix match in the duties and functions."  T. 88-89.  The ALJ asked about the classification of a receptionist, which Anderson testified was sedentary and semiskilled.  T. 89.  When asked if a receptionist would be required to have skills not required of a file clerk, Anderson responded that "[g]enerally speaking they tend to be very similar in capacities as far as – I mean there is going to be answering the phone and some light computer work."  T. 89.  The ALJ then said "[b]ut you would still be doing that as a file clerk too, is that right?"  T. 89.  Anderson responded "[i]t's a possibility.  Generally the same types of skills are required for both jobs."  T. 89.

The ALJ asked why the skills would not transfer from a file clerk to a receptionist, and Anderson responded that he thought they would. T. 89. He then acknowledged that he was changing his testimony in that regard and added that file clerk skills would transfer not only to a receptionist, but also to a telephone answering service operator. T. 89-90. The ALJ asked Anderson to confirm that the skills they had discussed – assembling files, operating office equipment, answering the telephone, and basic computer usage – were all interchangeable and transferrable within the positions of file clerk, receptionist, and telephone answering service operator. T. 90. Anderson agreed that they were. T. 90. He also testified that each job would accommodate someone who needed to sit and stand throughout the day but not someone who needed to lie down two or three times a day for an hour at a time. T. 90-91. On cross-examination, plaintiff's counsel asked Anderson if a file clerk who was not required to answer telephones would have acquired telephone answering skills. T. 91. Anderson testified that she would not. T. 91.

In her Decision, the ALJ found that claimant had a number of severe impairments: fibromyalgia, myofascial pain, fatigue, idiopathic torsion dystopia, spasmodic torticollis, migraine headaches, cervical degenerative disc disease, hyperthyroidism, and osteoarthritis of the sacroiliac joints and lumbar spine, all of which are supported by the medical evidence of record. T. 58. Moreover, plaintiff's medical records are replete with complaints of significant pain stemming from the conditions cited by the ALJ, for which plaintiff took an array of medications, including Opana, Lortab, Nucynta, Lyrica, Ultram, Ultracet, Effexor, Neurontin, Oxycodone, Flexeril, Zanaflex, and Valium. T. 16, 34, 41, 99, 360, 368-71, 374, 391, 392, 394-400, 445, 474, 479, 480, 514, 521, 525, 552. Plaintiff also received physical

therapy, cervical epidural injections, chiropractic manipulation, massage, muscle stretching, ultrasound, electric stimulation, trigger point pressure and injections, and aquatic therapy.  T. 31, 40-41, 99, 362-67, 391-402, 445-47, 483-513.  Claimant nevertheless consistently reported constant generalized burning into her neck, back, and arms and pain that was aching, throbbing, radiating, sharp, stabbing, shooting, and intolerable.  T. 16, 41, 409.

Plaintiff saw a number of doctors in an effort to manage her pain, including primary care physician, Laura S. Ray, M.D., who completed a Physical Capacities Evaluation ("PCE") on July 28, 2010.  T. 403.  In the PCE, Dr. Ray indicated that plaintiff could sit and stand/walk for less than one hour at a time, sit for three hours in an eight-hour work day, and stand for two hours in an eight-hour work day.  T. 403.  Dr. Ray also indicated that plaintiff could frequently lift and carry up to five pounds, occasionally lift and carry six to ten pounds, and never lift or carry anything above that. T. 403.  She further indicated that plaintiff could engage in limited simple grasping, no pushing and pulling of arm controls, limited fine manipulation, and no repetitive movements with her feet.  T. 403.  According to Dr. Ray, plaintiff could occasionally bend, squat, and reach but never crawl or climb.  T. 403.  In a Clinical Assessment of Pain ("CAP") completed the same say, Dr.Ray indicated that claimant's pain was frequently present and found to be intractable and virtually incapacitating.  T. 404.  She further stated that the side effects of claimant's medications could be expected to be severe and to limit claimant's effectiveness due to distraction, inattention, drowsiness, etc.  T. 404.

In a subsequent PCE completed on July 14, 2011, Dr. Ray indicated that plaintiff was able to sit and stand/walk for less than one hour at a time, sit for three

hours in an eight-hour work day, stand/walk for two hours in an eight-hour work day, and frequently lift and carry up to five pounds, occasionally lift and carry six to ten pounds, and never lift or carry anything above that.  T. 565.  She also indicated that plaintiff could not engage in simple grasping, pushing and pulling of arm controls, fine manipulation, or repetitive movements with her feet.  T. 565.  According to Dr. Ray, plaintiff was unable to bend or crawl but could occasionally squat and reach and frequently climb.  T. 565.  In a CAP, also completed on July 14, 2011, Dr.Ray reiterated that claimant's pain was frequently present and found to be intractable and virtually incapacitating and that the side effects of claimant's medications could be expected to be severe and to limit her effectiveness as a result of  distraction, inattention, drowsiness, etc.  T. 566.

One of plaintiff's chiropractors, Justin Southall, D.C., also completed a PCE on October 6, 2010.  T. 407.  Like Dr. Ray, Dr. Southall indicated that plaintiff could sit and stand for less than one hour at a time.  T. 407.  He opined that plaintiff could sit and stand/walk for two hours in an eight-hour work day and frequently lift and carry up to five pounds, occasionally lift and carry six to twenty pounds, and never lift or carry anything above that.  T. 407.  According to Dr. Southall, plaintiff could engage in simple grasping with both hands and repetitive movement with her feet but could not push or pull or engage in fine manipulation.  T. 407.  She also could occasionally bend, squat, climb, and reach but could never crawl.  T. 407.  On the CAP form, Dr. Southall indicated that plaintiff's pain was frequently present to such an extent as to be distracting to the adequate performance of work activities and that plaintiff's medications could cause side effects that imposed some limitations on her but not to such a degree as to create serious problems in most instances.  T. 408.  Dr.

Southall completed a Fibromyalgia Residual Functional Capacity Questionnaire on which he indicated that claimant met the American Rheumatological criterial for fibromyalgia, had been diagnosed with cervical degeneration disease and osteoarthritis, and had a fair prognosis with a guarded outcome due to her history. T. 405. Dr. Southall noted that claimant's symptoms included multiple tender points, carpal tunnel syndrome, numbness and tingling, chronic fatigue, depression, muscle weakness, and hypothyroidism with pain in her shoulders, arms, hand/fingers, hips, legs, knees/ankles/feet, lumbosacral spine, cervical spine, and thoracic spine. T. 405. He further noted that plaintiff's pain was precipitated by changing weather, fatigue, movement/overuse, cold, stress, and static position and often was severe enough to interfere with plaintiff's attention and concentration. T. 405. Dr. Southall indicated that claimant was markedly limited in her ability to deal with work stress and was not a malingerer. T. 405. Finally, Dr. Southall opined that plaintiff could sit and stand for forty-five minutes at a time and for approximately two hours in an eight-hour work day and could occasionally lift and carry less than ten pounds but never lift or carry anything above that. T. 406.

Another of claimant's chiropractors, Renee Lopez, D.C., completed a PCE on July 28, 2011. T. 568. Dr. Lopez opined that plaintiff could sit and stand for less than an hour at a time and for a total of two hours during an eight-hour work day. T. 568. According to Dr. Lopez, plaintiff could continuously lift and frequently carry up to five pounds, occasionally lift and carry six to ten pounds, and never lift or carry anything in excess of that. T. 568. Dr. Lopez indicated that plaintiff could not engage in simple grasping, pushing and pulling, fine manipulation, or repetitive movement of her feet; could occasionally bend, climb, and reach; but could never

squat or crawl.  T. 568.  On a CAP form, also completed on July 28, Dr. Lopez indicated that plaintiff's pain frequently was present, intractable, and virtually incapacitating and that plaintiff would be totally restricted and thus unable to function at a productive level of work as a result of her medications.  T. 567.

Finally, claimant's rheumatologist, W. F. Sullivan, M.D., completed a Fibromyalgia Residual Functional Capacity Questionnaire on September 8, 2011.  T. 589.  Like Dr. Southall, Dr. Sullivan indicated that plaintiff met the American Rheumatological criteria for fibromyalgia; he also indicated that plaintiff had other diagnosed impairments, including degenerative joint disease in the lumbar spine.  T. 589.  Dr. Sullivan noted that plaintiff's symptoms included multiple tender points, anxiety, chronic fatigue, and non restorative sleep with pain in her shoulders, hand/fingers, knees/ankles/feet, lumbosacral spine, cervical spine, and thoracic spine. T. 589.  Dr. Southall further noted that plaintiff's pain was precipitated by fatigue and movement/overuse and often was severe enough to interfere with her attention and concentration.  T. 589. According to  Dr. Southall, claimant was moderately limited in her ability to deal with work stress and was not a malingerer.  T. 589.  Dr. Southall opined that plaintiff could sit for two hours and stand for twenty minutes at a time, could sit for approximately four hours in an eight-hour work day, and could stand for less than two hours in an eight-hour work day.  T. 590.  In Dr. Southall's opinion, plaintiff could occasionally lift and carry less than ten pounds but never lift or carry anything above that.  T. 405.  In a CAP form completed the same day, Dr. Sullivan agreed with Dr. Ray's assessment that claimant's pain frequently was present to such an extent as to be distracting to the adequate performance of work activities and that the side effects of claimant's medication could be expected to be severe and to limit

her effectiveness due to distraction, inattentiveness, drowsiness, etc.  T. 591.

Based on all of the evidence, the ALJ assigned plaintiff an RFC to perform sedentary work limited to sitting for six hours out of eight and walking and standing for two hours out of eight.  T. 60.  She also found that plaintiff was required to have a sit/stand option in the workplace.  T. 60.  After determining plaintiff's RFC, the ALJ found that although claimant could not perform any past work, she had acquired transferable work skills from her past work as a file clerk.  T. 64-66.  Building upon that finding, and based on the testimony of the vocational expert, the ALJ concluded that claimant could work as a receptionist or telephone answering service operator.  T. 66.  Accordingly, the ALJ determined that plaintiff was not under a disability, as defined by the Social Security Act.

ANALYSIS

1.    ALJ's Hypothetical

Plaintiff first argues that the ALJ erred in failing to pose a proper hypothetical question to the vocational expert.  Such shortcoming harmed her, she says, because the ALJ's finding regarding ability to perform the jobs of receptionist and telephone answering service operator was based on expert testimony in response to a hypothetical that did not fairly or accurately depict her vocational profile.

As set forth above, the vocational expert testified that one who had acquired telephone answering skills could work as a receptionist and telephone answering service operator.  T. 89-90.  The ALJ asked the vocational expert whether those jobs would allow someone to sit and stand throughout the day, and the expert responded that "opportunities to sit and stand [would be available] throughout the workday."

Social Security Ruling 96-9p acknowledges that the need to alternately sit and stand erodes the sedentary occupational base and that the extent of such erosion depends on the facts of the case, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand.  SSR 96-9p further states that the "RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing" and that "[i]t may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work."  Despite these guidelines, the ALJ did not incorporate in her hypothetical any information regarding the frequency with which plaintiff would be required to alternate between sitting and standing or the length of time plaintiff would be required to stand; the ALJ likewise did not incorporate any information in the hypothetical pertaining to the extent to which the jobs of receptionist and telephone answering service operator would be conducive to plaintiff's limitations.

As the Eleventh Circuit has explained,"[i]f nonexertional impairments exist, the ALJ may use Medical–Vocational Guidelines as a framework to evaluate vocational factors, but must also introduce independent evidence, preferably through a vocational expert's testimony, of existence of jobs in the national economy that the claimant can perform."  *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002). "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments."  *Id.*  Because the ALJ failed to incorporate claimant's impairments in the hypothetical, the vocational expert's testimony does not constitute substantial evidence in support of the Commissioner's decision.  Indeed, the vocational expert's

testimony does not establish that there are any jobs that the plaintiff *in this case* is capable of performing.  *See id.* ("The ALJ must articulate specific jobs that the claimant is able to perform, and this finding must be supported by substantial evidence, not mere intuition or conjecture.").  Accordingly, the Commissioner erred in relying upon such faulty evidence.

2.    Transferrability of Skills

As the second assignment of error, plaintiff argues that the ALJ erred in finding that she has transferrable skills from her past relevant work as a file clerk.  Plaintiff points out that the finding of transferrable skills makes a critical difference in this case because, if plaintiff lacks such skills, she may be deemed disabled based on her age, education, and physical limitations.   As recognized in the regulations, "[i]ndividuals approaching advanced age (age 50–54) may be significantly limited in vocational adaptability if they are restricted to sedentary work.   When such individuals have no past work experience or can no longer perform vocationally relevant past work and have no transferable skills, a finding of disabled ordinarily obtains."  20 C.F.R. pt. 404, subpt. P, app. 2 § 200.00(g); *see also Watson v. Astrue*, 376 Fed. Appx. 953, 958 n. 11 (11th Cir. 2010).  "Whether an individual of advanced age (over age 55) has transferable skills 'depends largely on the similarity of occupationally significant work activities among different jobs.'"  *Zimmer v. Comm'r of Soc. Sec.*, 211 Fed. Appx. 819, 820 (11th Cir. 2006) (quoting 20 C.F.R. §§ 404.1568(d)(1), 416.968(d)(1)).   "Transferability is most likely among jobs that require the same or a lesser degree of skill, utilize the same or similar tools, and use the same or similar products, processes, or services."  *Id.* (citing 20 C.F.R. §§ 404.1568(d)(2), 416.968(d)(2)). "Complete similarity among all these factors is not

necessary for transferability." *Id.* (citing 20 C.F.R. §§ 404.1568(d)(3), 416.968(d)(3).

The ALJ determined that plaintiff has the RFC to perform a limited range of sedentary work except that she can sit for only six hours and walk/stand for only two hours in an eight-hour work day and must have a sit/stand option at her place of employment. Based on this RFC, the ALJ determined that plaintiff cannot perform any past relevant work. The ALJ also found that plaintiff acquired skills from her past relevant work as a file clerk that are transferrable to the positions of receptionist and telephone answering service operator. The ALJ's conclusion regarding the transferrability of plaintiff's skills relied upon testimony of the vocational expert in response to a hypothetical regarding plaintiff's past work as a file clerk. Curiously, the hypothetical depended upon the assumption that plaintiff acquired telephone answering skills while working as a file clerk when plaintiff had testified to her actual job duties, which did not include answering the telephone. Indeed, the undisputed evidence shows, as it did at the time of the hearing, that plaintiff's duties as a file clerk consisted only of pulling and re-shelving files and making copies. As the vocational expert testified, an individual who was not required to answer the telephone in a job would not have acquired telephone answering skills.

Again, the Eleventh Circuit has cautioned that "[i]f the ALJ finds that the claimant is able to perform other work, he must articulate specific jobs that the claimant is able to perform, and this finding must be supported by substantial evidence, not mere intuition or conjecture." *Davis-Grimplin v. Comm'r Soc. Sec. Admin.*, No. 13-12472, 2014 WL 702608, at *4 (11th Cir. Feb. 25, 2014) (internal marks omitted). Because the ALJ's finding regarding transferrability of claimant's skills was premised on an incorrect assumption, it is not supported by substantial

evidence.  Based on the overall tenor of the vocational expert's testimony and the evidence of record in this case, the court finds no substantial evidence that plaintiff acquired transferrable skills as a result of her past relevant work.  Considering that fact, as well as plaintiff's age, education, and physical limitations, the court will find plaintiff disabled as a matter of law.  *See* 20 C.F.R. pt. 404, subpt. P, app. 2 § 200.00(g); *Watson*, 376 Fed. Appx at 958 n.11.

3.    Credibility Assessment

The matter also is due to be reversed on claimant's remaining points.  Claimant argues that the ALJ erred with regard to the credibility assessment.  Despite the numerous references to pain in plaintiff's medical records, the ALJ found plaintiff's allegations regarding the frequency and severity of her pain "less than credible because she has alleged symptoms that are greater than those supported by the totality of the medical evidence." T. 64.  The ALJ also found plaintiff's allegations regarding the severity of her symptoms inconsistent with the plaintiff's actions, stating as follows:

> [a]lthough the claimant has described a very limited lifestyle, she did state that she visits with family, may go out to lunch on occasion, and to church . . . .  There is some evidence that her lifestyle may be more active than she has alleged.  For instance, on April 29, 2009, it is noted in the record that she had to quit caring for her mother-in-law . . . .  Although it is stating her illness caused her to quit caring for an individual, it is important to note that the claimant has never stated caring for her mother-in-law as part of her daily activities . . . .  The claimant testified that she quit working in 2007 because of her illness, yet, at some point after that, she was able to care for her mother-in-law . . . .  This generally calls her credibility into

> question.   Furthermore, on July 28, 2010, the claimant
> reported to Dr. Ray that she hurt her back while playing
> with her grandkids . . . .   When the claimant was asked
> about her daily activities at the hearing, she did not
> mention that she had grandkids or that she saw her
> grandkids . . . .   Such less than forthcoming testimony
> generally calls the claimant's credibility into question and
> suggests that she is able to do more activities on a regular
> basis than she has alleged.

T. 64.

Pain is treated by the Regulations as a symptom of disability.  Title 20 C.F.R.
§ 404.1529, provides, in part, that the Commissioner will not find disability based on
symptoms, including pain alone, "unless medical signs or findings show that there is
a medical condition that could be reasonably expected to produce these symptoms."
*Accord* 20 C.F.R. § 416.929.  The Eleventh Circuit has articulated a three-part pain
standard, sometimes referred to as the *Hand*[10] test, as follows:

> In order to establish a disability based on testimony of pain and other
> symptoms, the claimant must satisfy two parts of a three-part test
> showing: (1) evidence of an underlying medical condition; and (2) either
> (a) objective medical evidence confirming the severity of the alleged
> pain; or (b) that the objectively determined medical condition can
> reasonably be expected to give rise to the claimed pain.

*Wilson,* 284 F.3d at 1225 (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir.
1991)); *Adamo v. Comm'r of Soc. Sec.,* 365 Fed. Appx. 209 (11th Cir. 2010); *Elam
v. R.R. Retirement Bd.*, 921 F.2d 1210, 1216 (11th Cir. 1991).  The Eleventh Circuit

---

[10] *See Hand v. Bowen*, 793 F.2d 275, 276 (11th Cir.1986) (the case originally adopting the
three-part pain standard).

also has approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529 because that regulation "contains the same language regarding the subjective pain testimony that [the Eleventh Circuit] interpreted when initially establishing its three-part standard." *Wilson*, 284 F.3d at 1226.

Notably, "while both the Regulations and the *Hand* standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself." *Elam*, 921 F.2d at 1215. Indeed, the Eleventh Circuit has recognized that "pain alone can be disabling, even when its existence is unsupported by objective evidence." *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995) (citing *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992)); *Walker v. Bowen*, 826 F.2d 996, 1003 (11th Cir. 1987); *Hurley v. Barnhart*, 385 F. Supp. 2d 1245, 1259 (M.D. Fla. 2005). However, a reviewing court may consider the presence or absence of evidence to support symptoms of the severity of pain claimed. *Marbury*, 957 at 839-40; *Tieniber v. Heckler,* 720 F.2d 1251, 1253 (11th Cir. 1983).

If the Commissioner refuses to credit the plaintiff's subjective testimony concerning pain, she must do so explicitly and give reasons for her decision in that regard. *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986). Where she fails to do so, the testimony may be accepted as true as a matter of law.[11] *Holt*, 921

---

[11] In *MacGregor*, the court advised that:

If the Secretary refuses to credit such testimony he must do so explicitly and give reasons for that decision. *Walden v. Schweiker*, 672 F.2d 835, 839 (11th Cir.1982). Where he fails to do so we hold as a matter of law that he has accepted that testimony as true.

F.2d at 1223; *MacGregor*, 786 F.2d at 1054. Although the Eleventh Circuit does not require an explicit finding as to a claimant's credibility, the implication must be obvious to the reviewing court. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The credibility determination does not need to cite particular phrases or formulations, but it cannot merely be a broad rejection, which is insufficient to enable the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole. *Id.* (internal quotations and citations omitted). And of course, the reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. *Wilson*, 284 F.3d at 1225-26; *Jones v. Dep't of Health and Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991); *Hurley*, 385 F. Supp. 2d at 1259.

Underlying the *Hand* standard is the need for a credibility determination concerning a plaintiff's subjective complaints of pain. *See Shallow v. Schweiker*, 655 F.2d 645, 649 (5th Cir. 1981) (noting that "the ascertainment of the existence of an actual disability depended on [the ALJ's determination of] the truth and reliability of [the claimant's] complaints of subjective pain").[12] People with objectively identical conditions can experience significantly different levels of pain, and pain is more

---

786 F. 2d at 1054. Relying upon the earlier case of *Wiggins v. Schweiker*, 679 F.2d 1387, 1390 (11th Cir.1982), however, courts in the Eleventh Circuit are now generally opting for remand in cases of inadequate credibility determinations (as well as cases involving rejection of treating physician opinion). *See, e.g., Lawton v. Comm'r*, 431 Fed. Appx. 830, 835 (11th Cir. 2011); *see also Albery v. Comm'r of Soc. Sec.*, No. 6:11cv437-Orl-19GJK, 2012 WL 2589297, at *10 (M. D. Fla. June 7, 2012) ("The Eleventh Circuit has recently receded from [the *MacGregor*] language.").

[12] Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. Pritchard*, 661 F.2d 1206, 1207 (11th Cir.1981) (*en banc*).

readily and effectively treated in some than in others.  "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain.  This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ."  *Hand, supra,* at 1548-49.  It is within the ALJ's "realm of judging" to determine whether "the quantum of pain [a claimant] alleges [is] credible when considered in the light of other evidence."  *Arnold v. Heckler*, 732 F.2d 881, 884  (11th Cir. 1984).  Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that.  The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief or the plaintiff's claims, is the basis for the ALJ's credibility determination.

Here, plaintiff unquestionably was diagnosed with a number of conditions that reasonably could be expected to cause pain, including fibromyalgia, myofascial pain syndrome, and spasmodic torticollis.  Moreover, plaintiff's medical chart is replete with ongoing and consistent complaints of pain.  The medical records also make it clear that plaintiff had difficulty managing her pain, having been prescribed numerous pain medications and undergone various pain management procedures.  The *Hand* standard thus is facially satisfied.  The ALJ nevertheless discredited claimant's allegations based largely on two incidents claimant failed to mention when describing her daily activities – caring for her mother-in-law and playing with her grandchildren.  The ALJ, however, never asked plaintiff a question clearly eliciting the responses she faults plaintiff for not providing.  Instead, she asked plaintiff whether she engaged in "any activities at all, other than get up, go to bed, get up, go to bed," which plaintiff

reasonably could have construed as referring only to her current, daily activities.  T. 83.  And the ALJ failed to acknowledge that, on July 8, 2010, claimant reported that she was unable to play with her grandchildren, socialize more than an hour or two, or do anything other than "just maintaining."  T. 480.  The ALJ also failed to cite any medical evidence in support of her rejection of plaintiff's credibility.  The court thus agrees with the plaintiff that the ALJ unreasonably discredited plaintiff's testimony and finds that the Commissioner erred to the extent she relied upon the erroneous credibility determination.

4.    Treating Physician Opinions and RFC

Finally, plaintiff argues that the ALJ erred in rejecting the opinions of her treating physicians and in assigning the RFC, which plaintiff contends is not supported by the evidence of record.  Absent good cause, the opinion of a claimant's treating physician must be accorded considerable or substantial weight by the Commissioner.[13]  *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Broughton v. Heckler*, 776 F.2d 960, 960-61 (11th Cir. 1985); *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986).  "Good cause" exists when:  (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own

---

[13] The court recognizes that, as chiropractors, Drs. Southall and Lopez are not "acceptable medical sources" under the applicable regulations.  *See* 20 C.F.R. § 404.1513(a).  Nevertheless, their opinions may be considered with regard to the severity of plaintiff's impairments and the manner in which the impairments affect plaintiff's ability to work.  *See* 20 C.F.R. § 404.1513(d); *see also* SSR 06-03p.

medical records.  *Phillips,* 357 F.3d at 1241; *see also Lewis*, 125 F.3d at 1440 (citing cases).  If a treating physician's opinion as to the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record, the ALJ is to give it controlling weight.  *See* 20 C.F.R. § 404.1527(c)(2).  Where a treating physician has merely made conclusory statements, however, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen,* 816 F.2d 578, 582 (11th Cir. 1987).

The ALJ gave the opinions of plaintiff's treating physicians little weight because she found them inconsistent with the doctors' own treatment records and the longitudinal medical evidence.   T. 61, 63.   As examples of the alleged inconsistencies, the ALJ cited the fact that on June 24, 2010, Dr. Ray noted that plaintiff was not having any joint or muscle pains but completed a PCE one month later in which she indicated that plaintiff had debilitating pain and extreme limitations in abilities.  T. 61.  The ALJ also noted that Dr. Ray consistently found that claimant had normal gait and station and "performed lower extremity inspections bilaterally" that were "'normal.'"  T. 61.  The ALJ then turned to Dr. Ray's July 14, 2011, PCE, in which Dr. Ray imposed an additional restriction regarding plaintiff's ability to use her hands for simple grasping, fine manipulation, and pulling and pushing of arm controls.  According to the ALJ, not only was Dr. Ray's July 14, 2011, opinion inconsistent with her treatment notes and the longitudinal medical evidence, but there

was no objective medical evidence to support the additional restriction she imposed. T. 62.  The ALJ observed that Dr. Ray's medical records reflect no restrictions on claimant's performance of  activities and that Dr. Ray, in fact, advised plaintiff to walk for exercise.  T. 62.  She also acknowledged Dr. Ray's references to plaintiff's back and muscle pain, but noted that Dr. Ray once indicated that plaintiff had no joint pain or stiffness or muscle weakness.  T. 62.  Finally, the ALJ noted that Dr. Ray performed a mental status examination on plaintiff on multiple occasions and found that plaintiff demonstrated appropriate judgment and insight and that plaintiff's attention span and ability to concentrate were normal, which the ALJ found contradicted Dr. Ray's pain assessments.  T. 62.

As for Dr. Sullivan, the ALJ noted a July 2007 note that claimant appeared to be doing okay although reporting her medications caused constipation and fatigue. T. 63.  Dr. Sullivan also reported that claimant had good range of motion in her shoulders, elbows, wrists, hips, knees, and ankles and that claimant's strength was 5/5 in her upper and lower extremities and encouraged claimant to exercise.  T. 63-64. As the ALJ observed, Dr. Sullivan did not see plaintiff again until 2011, at which time he noted that plaintiff's muscles exhibited some tenderness and that plaintiff was positive for back pain and arthralgias but negative for joint swelling and gait problems and reported no side effects of her medications.  T. 64. In rejecting Dr. Sullivan's opinion, the ALJ also commented that the treatment records reflect no restrictions.  The ALJ acknowledged that the records reference neurological and psychological findings, but pointed out that there is no indication that plaintiff had difficulty concentrating as a result of pain or medications.  T. 64.

The ALJ made similar findings with respect to plaintiff's chiropractors.  T. 62-63.  Specifically, the ALJ gave Dr. Southall's opinion little weight because Dr. Southall is not an acceptable medical source and because Dr. Southall's opinion, in the ALJ's view, was inconsistent with the longitudinal evidence "which shows that while the claimant's condition generally waxes and wanes, her medications help improve her condition, and she has always presented to her physicians with good hygiene and appearance showing she can adequately perform her activities of daily living."  T. 63.  The ALJ likewise gave Dr. Lopez's opinion little weight because Dr. Lopez is not an acceptable medical source and because Dr. Lopez's opinion was "generally inconsistent with the longitudinal medical evidence, which shows that the claimant's condition improves with treatment and medications."  T. 63.

In discounting the opinions of plaintiff's treating physicians, it appears that the ALJ failed to consider the nature of plaintiff's alleged disability, which is pain.  As set forth above, pain is treated as a symptom of disability and alone can support of finding of disability if the medical evidence demonstrates a condition that reasonably could be expected to produce the symptoms alleged.  Title 20 C.F.R. §§ 404.1529, 416.929.  Objective proof of the pain itself is not required, although the court may consider the presence or absence of evidence to support the symptoms of the severity of pain claimed.  *Elam*, 921 F.2d at 1215; *Foote*, 67 F.3d at 1561; *Walker*, 826 F.2d at 1003; *Hurley*, 385 F. Supp. 2d at 1259.  In this case, plaintiff indisputably suffers from multiple medical conditions that reasonably could be expected to produce severe pain, and the medical records contain countless references to  plaintiff's complaints of pain and the degree thereof.  Although plaintiff's doctors may not have imposed

limitations on her other than when filling out forms pertaining to her disability claim, plaintiff was unemployed and lived a fairly sedentary lifestyle for most, if not all, of the time at issue, thus eliminating the need for any such restrictions.  And the fact that plaintiff may have retained most of her physical functioning does not undermine her complaints of pain or even the severity thereof.  Indeed, an individual does not have to be physically infirm in order to be disabled as a result of pain.  The court thus finds a lack of substantial evidence to support the Commissioner's reliance upon inconsistencies between the opinions of  plaintiff's treating physicians and the medical records of the same doctors.

Significantly, claimant's treating physicians uniformly agreed that she is unable to maintain full-time employment.  The only conflicting evidence is a Residual Functional Capacity Assessment completed on June 17, 2010, in which a single decision maker, who is not a medical doctor, acknowledged that claimant's medical records support a finding of significant limitations but opined that claimant nevertheless can sit and stand/walk for six hours of an eight-hour work day.  T. 95, 99.  Although the ALJ rejected the opinions of plaintiff's treating physicians, she did not adopt the limitations set forth in the RFC Assessment.  Instead, the ALJ found that plaintiff could sit for six hours out of eight and walk/stand for two hours out of eight, citing no medical evidence in support of her finding in that regard.  Where, as here, the ALJ "fail[s] to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted," *Hubbard v. Comm'r of Soc. Sec.*, 348 Fed. Appx. 553-54 (11th Cir. 2009) (internal marks omitted), and provides no explanation to link the evidence to the residual functional capacity

assessment, a reviewing court cannot determine whether the proper analysis occurred. Accordingly, the ALJ's acts rejecting the opinions of plaintiff's treating physicians, and determining RFC without regard to those opinions, are without support in substantial evidence.

The court notes that its findings in this matter are bolstered by a letter Dr. Ray prepared on March 6, 2012, after the ALJ rendered her decision, which was submitted to the Appeals Council in support of the plaintiff's claim.[14]  In the letter, Dr. Ray explained that she has treated plaintiff since 2002 for fibromyalgia and migraine headaches and that plaintiff's condition "has been progressive and complicated by the cervical degenerative disc disease which exacerbates both conditions." T. 594.  Dr. Ray described plaintiff's condition, as well as the discrepancies in the forms she completed, as follows:

> While there might not be a radiculopathy, the muscle pain and spasm are worsened in the bodies' [sic] attempt to prevent a nerve impingement.  Additionally cervicogenic migraines are well documented and tend to be more severe, last longer and be refractory to previously effective migraine medications.  I have observed all of these things with Sheree over the last several years.  She has the most intense and diffuse muscle spasm/rigidity in her back, neck and paraspinous muscles that I have ever seen.  She has required more intensive pain medication regimens over the lest [sic] several years as well which had increasing side effects including, but not limited to, mental impairment.

---

[14]"[W]hen a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether that new evidence renders the denial of benefits erroneous." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1262 (11th Cir. 2007).

While my office notes indicate alertness and cognitive functioning for the most part, it is likely due to the fact that she has foregone her medications long enough to come to my office because she knew she had to be unimpaired to drive to the appointment.  She definitely had slowing of her thought processes at our last visit (she had someone drive her).

Often, the only way she is able to get any relief is to lie down.  I can't think of any job that would allow one to change positions frequently and also allow a break to go lie down at random intervals.  When the pain is severe, any physical activity (push/pull/lift/carry) would be precluded as it would only aggravate the pain and spasm.  Her medications hinder fine motor control.  While previously her migraines were treatable with conventional medications, the addition of the cervicogenic component frequently puts Sheree to bed for days at a time.  The differences in my opinions on the physical disability forms are largely due to the progression and worsening of her illnesses and were based on the information that . . . Ms. Sametini gave me.

T. 594.

## CONCLUSION

For the reasons set forth above, the court finds that the Commissioner's decision is not supported by substantial evidence and by application of the proper legal standards and therefore should be reversed.[15]  *See Carnes*, 936 F.2d at 1218 ("[T]his Court may reverse the decision of the [Commissioner] only when convinced

---

[15] The court notes that, to the extent it reviewed the legal principles upon which the ALJ's decision is based, it conducted a *de novo* review.  *See Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

that it is not supported by substantial evidence or that proper legal standards were not applied.").  The court also finds that the plaintiff is entitled to the benefits she seeks.

**ACCORDINGLY, it is ORDERED:**

1.  Judgment will be entered in favor of plaintiff.  The decision of the defendant Commissioner is REVERSED and plaintiff's application for Disability Insurance Benefits is GRANTED.

2.  The court reserves jurisdiction for sixty (60) days in the event a motion for attorney's fees is filed.

**DONE AND ORDERED** this 18th day of March, 2014.


/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**